```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 2 0 2012
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
LEVERAGED INNOVATIONS, LLC,           :
                                      :
                       Plaintiff,     :      11 Civ. 3203 (KBF)
                                      :
             -v-                      :      MEMORANDUM & ORDER
                                      :
NASDAQ OMX GROUP, INC., NASDAQ OMX    :
BX, INC., NASDAQ BX EQUITIES, LLC,    :
NASDAQ OMX PHLX, INC., THE NASDAQ     :
STOCK MARKET LLC, PROSHARE ADVISORS   :
LLC, PROSHARES TRUST I, and           :
PROSHARES TRUST II,                   :
                                      :
                       Defendants.    :
------------------------------------- X

KATHERINE B. FORREST, District Judge:

Defendants ProShare Advisors LLC, ProShares Trust I, and ProShares Trust II (collectively, "ProShares") move for partial summary judgment on plaintiff Leveraged Innovations, LLC's ("plaintiff" or "Leveraged") claims of willful infringement of United States Patent No. 7,698,192 (the "'192 patent") as to 127 of the 131 ProShares exchange traded funds ("ETFs") at issue.

Plaintiff filed its opposition to ProShares' motion on March 9, 2012, and the motion was fully submitted as of March 19, 2012. The Court heard oral argument on the motion on April 5, 2012.

For the reasons set forth below, ProShares' motion for partial summary judgment is GRANTED.

## BACKGROUND[1]

The following facts are undisputed, unless otherwise noted.[2] Plaintiff alleges that ProShares infringed the '192 patent through, at a minimum, 121 leveraged ETFs. The '192 patent lists Kenneth Kiron and Kevin S. Bander as inventors. The '192 patent states that it is a continuation of application No. 09/579,801, which is a continuation of application No. 09/140,868, which is now Patent No. 6,088,685 (the "'685 patent"). The '192 patent underwent two assignments: first, from a company called Mopex, Inc. ("Mopex") (of which Bander and Kiron were both principals) to Kiron on April 10, 2008, and then from Kiron to Leveraged Innovations, LLC on April 9, 2010.

The '685 patent was the subject of litigation between Mopex and the American Stock Exchange LLC ("AMEX") in an action before Judge Scheindlin entitled American Stock Exchange, LLC v. Mopex, Inc., No. 00 Civ. 5943 (S.D.N.Y.) ("AMEX v. Mopex"). AMEX commenced that action in 2000. On February 4, 2003, Judge Scheindlin granted summary judgment to AMEX, finding the '685

---

[1] The parties filed a number of documents under seal or in redacted form in connection with this motion. Because the motion was the subject of oral argument, the Court deems the confidentiality of subjects discussed in open court--i.e., all topics material to the resolution of this motion--waived.

[2] To the extent that the Court does not recount a fact set forth in ProShares Statement of Uncontroverted Facts or Leveraged's Counterstatement of Additional Material Facts, the Court did not find the fact relevant to resolution of the instant motion.

2

patent invalid as anticipated by prior art. Am. Stock Exch., LLC v. Mopex, Inc., 250 F. Supp. 2d 323 (S.D.N.Y. 2003).

Subsequent to that decision, the parties in AMEX v. Mopex entered into a Settlement Agreement and Release in March 2003 (the "Settlement Agreement"), which, by its terms, avoided entry of a final judgment of invalidity as to the '685 patent, and necessarily curbed further litigation, including defendants' pursuit of attorneys' fees, etc. In addition, the Settlement Agreement included various covenants by Mopex not to sue. The Settlement Agreement, in other words, "bought peace."

Most relevant to the instant motion, Mopex covenanted not to sue "any AMEX-Listed ETF Fund." (See Settlement Agreement ¶ 10 (Decl. of James R. Myers in Support of the Mot. of Defs. For Partial Summ. J. Ex. 1; Decl. of Joshua Raskin in Opp'n to the ProShares' Defs. Mot. for Partial Summ. J. Ex. 1).) Specifically, Mopex warranted that it would not sue or require a royalty or compensation from

> any AMEX-Listed ETF Fund for any alleged infringement of any of Mopex's Patent Rights or alleged infringement of any patent, trade secret, or other intellectual property related to [ETFs], provided that such alleged infringement resulted from activities undertaken with respect to or in connection with an [ETF] that is at the time of the alleged infringement listed for trading on the AMEX . . . .

(Settlement Agreement ¶ 10 (hereinafter "the Release" or "paragraph 10").)

3

Under the Settlement Agreement, AMEX means

> American Stock Exchange LLC, as well as its parent, subsidiaries, AMEX Current Affiliate (as defined [in the Settlement Agreement]), predecessors, <u>successors</u>, divisions, operating units, officers, directors, employees, attorneys, heirs, representatives, spin-offs, and assigns.

(Settlement Agreement ¶ 1(a) (emphasis added).) The definition of "AMEX" specifically excludes "the Nasdaq Stock Market." (<u>Id.</u>)

"Mopex" is defined to include not only Mopex, Inc., but also certain companies related to Kiron or Bander, as well as their "subsidiaries, affiliates, predecessors, successors, division, operating units, principals, officers, directors, shareholders," etc. (Settlement Agreement ¶ 1(j).) As covered by the Settlement Agreement, Mopex's "Patent Rights" relate not only to the '685 patent, but also to, <u>inter alia</u>, any other continuation from an application "claiming priority" from the application from which the '685 patent derived--<u>e.g.</u>, the '192 patent here. (<u>Id.</u> ¶ 1(k).) The Settlement Agreement was signed by, <u>inter alia</u>, Kiron--Leveraged's President and Chief Executive Officer.

An "AMEX-Listed ETF" is, in pertinent part, defined as an ETF "listed exclusively for trading on the AMEX." (Settlement Agreement ¶ 1(f).)[3]

---

[3] The Settlement Agreement defines an ETF as "an investment company . . . that (1) is structured in such a way as to allow its shares to be traded on a

4

Those definitions are of particular import in light of New York Stock Exchange ("NYSE") Euronext's 2008 acquisition of AMEX (the "acquisition"). It is uncontradicted that the possibility that AMEX might be acquired was publicly known as early as 2002--i.e., prior to entry into the Settlement Agreement. When the Settlement Agreement was executed in 2003, the parties were thus "on notice" that AMEX might well change its corporate form.

A central issue in this dispute is precisely what became of "AMEX" as a result of the acquisition. Although the name of the entity itself is not controlling of the outcome of this motion, the parties spend a fair amount of time debating that question. ProShares asserts that AMEX became NYSE Amex LLC while plaintiff maintains that AMEX became NYSE Alternext US. As the release by the Securities Exchange Commission ("SEC") cited by plaintiff makes clear, "At the time of the acquisition of [AMEX] by NYSE Euronext on October 1, 2008, the name of the Exchange [i.e., NYSE Alternext US LLC], as the successor entity to Amex, was initially established as 'NYSE Alternext US LLC.'" SEC Release No. 34-59575 (Mar. 13, 2009) at 2. The release goes on to state that "the Exchange has determined that for branding purposes it would be desirable to retain some reference to the historic Amex exchange in the name of the Exchange." Id. The name became

---

securities exchange or marketplace, and (2) issues continuously redeemable securities that may be bought from the fund at net asset value or sold to the fund at net asset value. . . . ." (Settlement Agreement ¶ 1(g).)

5

"NYSE Amex LLC," and the "Certificate of Formation of the Exchange" and NYSE's Operating Agreement were amended to reflect as much. See id. Thus, NYSE Amex LLC ("NYSE Amex") is a successor to AMEX, regardless of the name change, as reflected in the relevant corporate documents. NYSE Amex is a subsidiary of NYSE Group, which itself is a subsidiary of NYSE Euronext. NYSE Amex remains in existence and operation today.

As part of the acquisition, NYSE Euronext and AMEX announced an initiative to transfer all Exchange-Traded Products ("ETPs")[4] and structured product listings (including all ETFs) from AMEX to NYSE Arca, Inc. ("NYSE Arca" or "Arca")--another subsidiary of NYSE Group.[5] (That transfer will be referred to hereinafter as the "transfer initiative.") As part of the transfer initiative, NYSE Euronext and AMEX also agreed to move AMEX's ETP "business unit" (the "ETP business") which serviced the ETPs traded on AMEX to NYSE Arca.[6] NYSE Euronext and AMEX announced the acquisition and the transfer initiative

---

[4] The Court will use the terms "ETP" and "ETF" interchangeably for purposes of this motion only.

[5] (Decl. of Laura Morrison ("Morrison Decl.") ¶ 4.)

[6] (Morrison Decl. ¶ 10 & Exs. B, C; Decl. of George Foster in Support of the ProShares Mot. for Partial Summ. J. Exs. DD, FF, GG.)

Without citation to anything--let alone admissible evidence, plaintiff disputes that the ETP "business unit" moved to Arca. However, plaintiff's assertion is unsupported by admissible evidence to the contrary, and, on its own, cannot create a material issue of fact. The Court therefore deems the fact undisputed. See Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2).

simultaneously. The transfer initiative was completed in or around October 2008, when the acquisition closed.[7]

AMEX's ETP business included the three-person Index/IOPV team--which calculated the indices and benchmarks against which ETPs are valued--and the eight-person Fund Products team--which assisted ETP issuers in "bringing their products to market."[8] Subsequent to the acquisition and as part of the transfer initiative, the remaining eight employees who supported the ETP business at AMEX were hired by NYSE Euronext to service the ETP business on NYSE Arca. In addition, AMEX brought over to NYSE Arca its "Index Calculation system" as well as its transfer protocol servers, websites, and databases.[9] As required by the Securities and Exchange Commission ("SEC"), the transfer initiative required that ETPs delist from AMEX and relist on NYSE Arca, including those ETFs owned by ProShares.[10]

The ProShare Trust entities together offer 131 ETFs--113 by ProShares Trust I (64 of which were listed on AMEX prior to the

---

[7] (See Morrison Decl. ¶ 4 & Ex. B.)

[8] In its Rule 56.1 statement, ProShares stated that AMEX's "main" ETP business included those two teams. (ProShares Stmt. of Material Facts ¶ 35.) Leveraged neither admitted nor denied that fact because it claimed that the term "main" is ambiguous. That bald assertion is insufficient to create an issue of material fact.

[9] (Morrison Decl. ¶¶ 4-6, 8-10.) In addition, AMEX closed its New York office and moved to NYSE Euronext's offices. (Id. ¶ 7.)

[10] Leveraged notes that such delisting and relisting came at ProShares' election--not through the efforts of AMEX or NYSE. As discussed below, the delisting and relisting was a requirement imposed by the SEC.

7

acquisition--and were delisted from AMEX and relisted on NYSE Arca, where they remain today) and 18 by ProShares Trust II. Of their 131 ETFs, ProShares now lists 127 on NYSE Arca. Sixty-four of the 127 were, as mentioned, listed on AMEX prior to the acquisition; the remaining 63 were launched subsequent to the acquisition.

Leveraged asserts that the "time of the alleged infringement"--per the Release--is April 13, 2010 (i.e., the date the '192 patent issued) through the present. The Court accepts that as an undisputed fact only as to the time period of "alleged infringement"; ProShares flatly contests it is infringing the '192 patent. It is undisputed, however, that all of the 127 ProShares ETFs at issue on this motion were listed on NYSE Arca sometime after April 13, 2010.

## DISCUSSION

### I. Legal Standard

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the court must "construe all evidence in the

8

light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 539 F.3d 159, 166 (2d Cir. 2010) (citations omitted). Only disputes over material facts--i.e., "facts that might affect the outcome of the suit under the governing law"--will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

9

II. Covered by the Settlement Agreement

Under New York law,[11] "the initial interpretation of a contract is a matter of law for the court to decide." K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quotation marks omitted). "[I]f the contract is capable of only one reasonable interpretation, i.e., is unambiguous, [the Court] is required to give effect to the contract as written." Id. That exercise necessarily requires carrying out the intent of the parties in entering into the contract. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000) ("The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement.").

Here, there is no question--and neither party disputes--that the purpose of the Settlement Agreement was to "buy peace" as between "Mopex" and "AMEX" for alleged infringement of the '685 patent (and its "descendants") relating to ETFs listed on AMEX. (See Settlement Agreement ¶¶ 1(f), 10.) How far that peace extends--or was intended to extend--is at issue on this motion. The Court concludes that the peace reaches those ETFs

---

[11] The Settlement Agreement contains a New York choice of law provision. (Settlement Agreement ¶ 16.)

10

listed on NYSE Arca.  The claims as to the 127 ProShares ETFs listed on NYSE Arca must be dismissed based upon the Release.

To be covered by paragraph 10 of the Settlement Agreement, the 127 ProShares ETFs must (a) be an "AMEX-Listed ETF Fund," and (b) have been listed "at the time of the alleged infringement" on "AMEX."  (See Settlement Agreement ¶ 10.)  In other words, the ProShares ETFs must be ETFs "listed exclusively for trading on" "the American Stock Exchange LLC, [or] its parent, subsidiaries, AMEX Current Affiliates, predecessors, successors, divisions, operating units, officers, directors, employees, attorneys, heirs, representatives, spin-offs, and assigns" sometime between April 13, 2010 and the present.  (See Settlement Agreement ¶¶ 1(a) (parenthetical omitted), 1(f), 10.)

There is no dispute as to the fact that the ProShares ETFs at issue were listed on Arca sometime between April 13, 2010 and the present.  There is a dispute, however, over whether Arca falls under the definition of "AMEX"--specifically, whether it is a "successor" to AMEX for purposes of the Settlement Agreement.  Accordingly, there is only one question the Court must answer in resolving this motion:  does the transfer of all of AMEX's ETP and structured product listing and of AMEX's ETP business to NYSE Arca make Arca a "successor" to AMEX as

11

contemplated by paragraph 10 of the Settlement Agreement?[12] After serious consideration of the issue, close reading of the parties' submissions, and hearing oral argument, the Court concludes that the answer to the question is "yes."

"Successor" is indeed a fluid--or "plastic," as the Second Circuit put it--term. See Dunkley Co v. Calif. Packing Corp., 277 F. 996, 999 (2d Cir. 1921). There is no set of definitive characteristics or hallmarks--as much as plaintiff would like distribution of shares back to the parent or its shareholders to be[13]--that conclusively denotes an entity is a "successor." According to Black's Law Dictionary, a successor is "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." Black's Law Dictionary (9th ed. 2009);

---

[12] ProShares argues that the 64 ProShares Trust ETFs that were previously listed on AMEX are "clearly subject" to the Release. The Release, however, specifically includes language that states that covered ETFs must be listed on AMEX "at the time of the alleged infringement." (Settlement Agreement ¶ 10.) That time period here is sometime between April 13, 2010 to the present. The acquisition occurred in 2008--meaning AMEX ceased to exist at that time in the form it was in at the time the Settlement Agreement was executed (i.e., 2003). Thus, the question remains the same for all 127 ProShares ETFs listed on Arca.

[13] Plaintiff is not wrong on this point with respect to a "spinoff"--the other term on which ProShares focuses. A "spin-off" is "a corporate divestiture in which a division of a corporation becomes an independent company and stock of the new company is distributed to the corporation's shareholders." Black's Law Dictionary (9th ed. 2009); accord Barron's Dictionary of Finance & Investment Terms 658 (6th ed. 2003) ("form of corporate divestiture that results in a subsidiary or division becoming an independent company. In a traditional spin-off, shares in the new entity are distributed to the parent corporation's shareholders of record on a pro rata basis."). There is nothing in the record that Arca made a distribution of shares back to NYSE Amex's shareholders after the transfer of the ETP business; therefore, the Court will not consider the question of whether the term "spin-off" is applicable.

accord Gismondi, Paglia, Sherling, M.D., P.C. v. Franco, M.D., 206 F. Supp. 2d 597, 600 (S.D.N.Y. 20220); ETF Int'l Assoc., Inc. v. Am. Stock Exch. LLC, 87 A.D.3d 464, 464 (1st Dep't 2011).

The "rights and duties" at issue here are those associated with listing ETFs that were previously listed on the American Stock Exchange. On the record before the Court, there is no triable issue of fact over whether NYSE Arca possesses the rights and duties associated with listing all ETPs and structured products that were listed on AMEX prior to the acquisition. ProShares has submitted evidence (see supra nn. 7-9) that such rights and duties were transferred--and that evidence remains factually undisputed.[14] It is also undisputed that Arca obtained those rights and duties as a product of the "amalgamation" or "consolidation" of AMEX and NYSE Euronext.

ProShares focuses on the transfer of the ETP business from NYSE Amex to Arca to demonstrate that the entirety of the entity relating to AMEX-listed ETFs--e.g., the employees, the Index Calculation system, the transfer protocol servers, websites, and databases--transferred such that Arca is the successor to AMEX's ETF/ETP-listings. Whether that makes Arca a successor is something that must be informed by principles of not only

---

[14] Plaintiff asserted at oral argument that there was factual disputes but the record is devoid of evidence creating a fact issue.

13

corporate form, but also common sense--i.e., the parties' intent regarding paragraph 10 of the Settlement Agreement. A conclusion that the parties to the Settlement Agreement intended the entity that lists the ETPs previously listed on AMEX--supported by the infrastructure that supported AMEX's ETP listings--to be anything other than AMEX's "successor" defies common sense. Had AMEX not been informed by its intent to "buy peace" during the acquisition, it is possible that the listings would have been transferred without the ETP business. But they were not--and now, as it clear from the evidence before the Court, the entirety of the "rights and duties" associated with listing ETFs as they were on AMEX lies with Arca.

Plaintiff argues that only NYSE Amex can be AMEX's successor. According to plaintiff, only NYSE Amex is the direct lineal descendant of AMEX and thus, the transfer to Arca is one step too removed from the original AMEX entity to constitute a "successor." That ignores the language of the Settlement Agreement in two ways. First, there is nothing within the terms of the Settlement Agreement--and plaintiff has not submitted evidence to the contrary--which limits the number of successors, nor whether there may be successors (other than NYSE Amex) to parts or divisions of AMEX. Indeed, the Settlement Agreement provides that AMEX could have multiple "successors." (Settlement Agreement ¶ 1(a).) Second, that argument places

14

form over substance.  In the Settlement Agreement, drafted at a time when the parties specifically understood AMEX might be acquired, a series of possible terms were used plainly to try to capture likely and reasonable movements of AMEX's ETF-listing operations into another entity.  (See id.)  Giving effect to the parties' intent in the context of the Release and the Settlement Agreement as a whole, the parties clearly intended "successors" to include the successor to the part or division of AMEX that listed ETFs.  (See id. ¶¶ 1(f), 8-10.)  No other equitable reading of the Release would make sense.

Plaintiff has argued strenuously that Arca is *not* the successor to AMEX's ETP listings.  But other than tracing corporate names (e.g., NYSE Alternext versus NYSE Amex) and pointing out that the delisting and relisting of ProShares ETFs came at ProShares' election (as discussed below), plaintiff has failed to submit evidence creating a triable issue that Arca is *not* the successor.  The evidence submitted by ProShares supports that it is.  To find otherwise would be to elevate the names of entities over the established and uncontroverted facts in the record, and to ignore that the Settlement Agreement was intended to "buy peace" once and for all for AMEX listed-ETFs as to "Mopex" (which, per the Settlement Agreement's definition, includes Leveraged).  It cannot be--and is not the case--that the peace AMEX so carefully bought disappeared simply because

15

Arca, while the successor to all of AMEX's ETP listings and to the supporting ETP business, does not bear the name AMEX.

In its careful consideration of this motion, the Court could not conjure what additional evidence ProShares could develop during discovery to demonstrate that Arca is the successor "listor" to AMEX's ETF listings. It cannot possibly be the case that if Arca is not the successor to AMEX's ETFs listings that all ETFs must be transferred back to NYSE Amex such that the parties' intent to "buy peace" can be effected. The record here is clear: as part of the acquisition, NYSE Euronext specifically decided to transfer all of AMEX's ETP listings as well as the ETP business to Arca. The fact that NYSE Amex transferred to Arca all of the "assets" that supported the ETP trading and listing business--e.g., the employees, the Index Calculation system, the transfer protocol servers, websites, and databases--underscores AMEX's intent to "buy peace." As discussed above, there is evidence in the record before this Court that the entirety of AMEX's "rights and duties" associated with listing ETPs now sit with Arca, making it AMEX's successor ETP "listor."

That all ETP listings were delisted from AMEX and relisted on NYSE Arca is simply a formality borne of SEC requirements. That is, contrary to plaintiff's assertions, not dispositive of the fact that Arca is not the successor "listor" to AMEX's ETF

16

listings. The same formality would have been required regardless of where the ETPs were listed. The fact that 381 AMEX-listed ETFs <u>all</u> delisted from AMEX and relisted (albeit not simultaneously) on Arca provides additional support for the fact that Arca is the successor to AMEX's ETF listings. That demonstrates to the Court that AMEX-Listed ETFs (or the entities listing those ETFs) understood Arca to be AMEX's successor in that context--as did NYSE Euronext and AMEX at the time they announced the transfer initiative.[15]

The undisputed facts lead to the conclusion that the parties intended that any entity that succeeded to listing all of AMEX's ETPs--supported by AMEX's ETP business--was AMEX's "successor" as it was understood by the parties to the Settlement Agreement. Thus, the 127 ProShares' ETFs are AMEX-Listed ETFs that were listed on "AMEX" at the time of the alleged infringement. Accordingly, those ETFs cannot be subject to litigation for infringement of the '192 patent (as successor to the '685 patent) under the Release.

The claims as to those 127 only are dismissed. No claims remain as to defendant ProShares Trust II. Claims as to four ETFs remain against defendants ProShare Advisors and ProShares Trust I.

---

[15] (<u>See</u> Morrison Decl. Ex. B; Decl. of George Foster in Support of the Mot. of ProShares for Partial Summ. J. Exs. DD, EE.)

CONCLUSION

For the aforementioned reasons, the ProShares Defendants' motion for partial summary judgment is GRANTED.

The ProShares Defendants and Leveraged Innovations are directed to contact the chambers of Magistrate Judge Peck no later than April 30, 2012, in order to schedule settlement discussions under his supervision.

The Clerk of the Court is directed to terminate the motion at Docket No. 46.

SO ORDERED:

Dated:   New York, New York
         April **20**, 2012

                                                                             _____
                                                                             KATHERINE B. FORREST
                                                                  United States District Judge